IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL S. HOUSE, | ) | CASE NO. 5:12-CV-1259 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES GWIN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT & RECOMMENDATION |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to local rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff Michael House's applications for a Period of Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C § 1381 *et seq*., is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends that the decision of the Commissioner be **VACATED** and **REMANDED**.

I. PROCEDURAL HISTORY

On April 23, 2008, Plaintiff Michael House ("Plaintiff" or "House") applied for Supplemental Security Income benefits, as well as Disability Insurance benefits. (Tr. 104-07, 108-114). House alleged he became disabled on July 10, 2007, due to suffering from bipolar disorder, personality disorder and diabetes. (Tr. 206). Plaintiff's applications were denied initially and upon reconsideration. (Tr. 69-74, 75-80). On December 15, 2008, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 89-90).

Administrative Law Judge Edmund Round (the "ALJ") convened a hearing via video on November 8, 2010, to hear House's case.  (Tr. 37-61).  The ALJ presided over the hearing from Cleveland, Ohio.  (Tr. 19, 39).  Plaintiff, represented by counsel, appeared in Canton, Ohio from counsel's office.  (Tr. 39).  Kevin Yi, a vocational expert, attended the hearing and provided testimony in Cleveland, Ohio.  (*Id*.).

On December 29, 2010, the ALJ issued his decision applying the five-step sequential analysis[1] to determine whether Plaintiff was disabled.  (Tr. 19-31).  Based on his review, the ALJ concluded House was not disabled.  (*Id*.).  Following the issuance of this ruling, Plaintiff sought review of the ALJ's decision from the Appeals Council.  (Tr. 15).  However, the council denied House's request, thus rendering the ALJ's decision the final decision of the Commissioner.  (Tr.

---

[1]  The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

  (1)   If a claimant is doing substantial gainful activity – i.e., working for profit – she is not disabled.

  (2)   If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

  (3)   If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

  (4)   If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

  (5)   Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

10-14).  Plaintiff now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  PERSONAL BACKGROUND INFORMATION

House was born on August 17, 1978, and was 28 years old as of his alleged disability onset date, and 32 years old at the time of the hearing.  (Tr. 43).  Accordingly, at all times during the period under review, he was considered as a "younger person" for Social Security purposes. *See* 20 C.F.R. §§ 416.963(c), 404.1563(c).  Plaintiff's highest level of education was the eighth grade.  (Tr. 43).  He has past experience working in a variety of positions, such as a fry cook, dishwasher, gas station clerk, bookstore clerk, general laborer and construction worker.  (Tr. 55-56).

## III.  MEDICAL EVIDENCE[2]

Plaintiff's mental impairments and alcohol dependence date back prior to his alleged disability onset date.  (Tr. 463-70).  House first sought treatment for these problems during the relevant period on November 9, 2007.  (Tr. 363).  At that time he presented to the Crisis Recovery Center ("CRC") complaining of difficulty controlling his emotions and desiring to have his medications adjusted.  (*Id*.).  Plaintiff was also struggling with family issues related to his recent marriage.  He was advised to attend group therapy sessions, attend AA meetings and decrease his alcohol intake.  (Tr. 364).  House presented back to the CRC in December 2007. (Tr. 424).  A psychiatrist noted Plaintiff reported "some positive response" to his medications, and advised Plaintiff of the negative effects of consuming alcohol while taking them.  (Tr. 427).

---

[2] The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration in reaching its ruling.

In December 2007, Dr. Karen Stailey-Steiger, a state agency consultant, assessed House's mental residual functional capacity ("RFC").  (Tr. 366-68).  Dr. Stailey-Steiger noted House's history of alcohol dependence and depression.  (Tr. 368).  However, she concluded he was capable of performing simple routine tasks.  (*Id*.).

In April 2008, Plaintiff was arrested for driving under the influence of alcohol.  (Tr. 404).  Upon discovering that Plaintiff's blood sugar levels were high, officers transported him to the emergency room.  (*Id*.).  House was admitted to the hospital and treated for hyperglycemia, type 1 diabetes and depression.  (*Id*.).  Doctors indicated that House seemed "very depressed, hopeless, helpless [and] worthless with suicidal thoughts."  (Tr. 397).  Plaintiff was also documented to have poor insight and judgment.  (*Id*.).

On June 27, 2008, state agency consultant, Dr. Karla Voyten, evaluated Plaintiff's mental RFC.  (Tr. 445-48).  She diagnosed Plaintiff with bipolar disorder, personality disorder and diabetes mellitus.  (Tr. 447).  Dr. Voyten noted that Plaintiff had recently separated from his wife and that his daily activities remained functional.  (*Id*.).  She opined that House was able to work in jobs requiring one and two step instructions.  (*Id*.).

On July 8, 2008, Plaintiff reported back to the CRC with complaints of sleeplessness and being easily irritable and angry at times.  (Tr. 458).  Plaintiff denied any suicidal thoughts and indicated that he had not consumed alcohol in a month.  (*Id*.).  Records show that Plaintiff had been regularly seeing his therapist and was advised to cut back on caffeinated beverages.  (Tr. 459).

On September 15, 2008, state agency consultant, Dr. Catherine Flynn, reviewed House's medical record and affirmed the mental RFC assessment completed by Dr. Voyten.  (Tr. 475).

4

On November 17, 2008, Plaintiff saw Dr. Ike Nkanginieme[3] for a psychiatric evaluation after complaining of mood swings.  (Tr. 500-02).  Dr. Nkanginieme found House was alert and oriented and that his insight and judgment skills were fair.  (Tr. 501).  Dr. Nkanginieme diagnosed House with bipolar disorder, alcohol dependency and noted that House had a history of DUI convictions.  (Tr. 502).  The doctor assessed Plaintiff's Global Assessment of Functioning ("GAF") score[4] at 65 and prescribed him medication to help control his mood swings.  (*Id*.).

Plaintiff continued to see Dr. Nkanginieme regularly.  In December 2008, House informed the doctor that he was still experiencing problems with sleeping and feeling very depressed and groggy.  (Tr. 499).  He also reported that his mind raced and that he did not feel his medications were helping.  (*Id*.).  Dr. Nkanginieme found that Plaintiff was "fairly stable" overall, provided supportive psychotherapy to Plaintiff and encouraged him to attend group therapy.  (*Id*.).  In January 2009, Dr. Nkanginieme adjusted Plaintiff's medication because Plaintiff indicated that one of his prescriptions made him groggy.  (Tr. 498).

Plaintiff reported feeling worse during his meeting with Dr. Nkanginieme in August 2009.  (Tr. 496).  Dr. Nkanginieme added avoidant personality disorder to Plaintiff's diagnosis.  (*Id*.).  The next month House continued to complain of mood swings, irritability, depression and anxiety, and did not feel his medications were helping.  (Tr. 493-94).  Dr. Nkanginieme adjusted House's medications and assigned him a GAF score of 50.  (Tr. 493-94).  Plaintiff again reported

---

[3] Plaintiff referred to Dr. Nkanginieme as Dr. Ike.

[4] The GAF score represents "a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning."  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503, n. 7 (6th Cir. 2006).

racing thoughts during his appointments with Dr. Nkanginieme in October 2009. (Tr. 489, 486). Subsequently, the doctor adjusted House's medications. (*Id*.). In February 2010, House was still complaining of problems with insomnia and depression. (Tr. 483). Dr. Nkanginieme adjusted his prescriptions accordingly. (*Id*.).

On February 17, 2010, House was admitted to Aultman Hospital after presenting to the emergency department with suicidal thoughts. (Tr. 525, 528). At admission, Plaintiff's affect was blunted and Dr. Nkanginieme listed his insight and judgment as impaired. (Tr. 528). House's diagnosis included major depressive disorder (severe and recurrent), a history of alcohol abuse, narcissistic injury and diabetes. (Tr. 525). Dr. Nkanginieme also noted that House was struggling with his break up from his wife and "fail[ed] to accept the situation and move on." (*Id*.).

On May 11, 2010, Plaintiff was again admitted to the hospital for suicidal thoughts. (Tr. 518-19). Dr. Nkanginieme indicated Plaintiff was not fully contracting to safety, and that his insight, judgment and activities of daily living remained impaired. (Tr. 518). The doctor also talked to House about his gambling problems, which House admitted had caused him to lose approximately $30,000. (*Id*.). Plaintiff had not been taking his medications. (Tr. 519). Dr. Nkanginieme started him on a new medication regimen and hoped it would give House a new sense of optimism. (Tr. 518). In a treatment note dated May 27, 2010, Dr. Nkanginieme indicated Plaintiff was more compliant with his medication and group therapy. (Tr. 479).

On June 15, 2010, Dr. Nkanginieme completed an assessment of House's mental functioning. (Tr. 512-16). In the questionnaire, Dr. Nkanginieme was asked to rate Plaintiff's

mental ability and aptitude to perform various tasks comprising unskilled work. [5]  (Tr. 514-15).
Of note, the doctor concluded House retained "no useful ability to" maintain regular attendance
or to be punctual at work.  (Tr. 514).  Dr. Nkanginieme further opined that House was "unable to
meet competitive standards" to perform 10 out of the 25 mental tasks examined, and that House
was "seriously limited, but not precluded" from performing the remaining tasks.  (Tr. 514-15).
The doctor also added that Plaintiff would likely miss more than four days of work each month,
and that Plaintiff's prognosis was guarded.  (Tr. 512, 516).

House was also admitted to the hospital on June 23, 2010.  (Tr. 538).  Dr. Nkanginieme's
treatment note stated that House was "somewhat regressed, sensitive and depressed."  (*Id*.).
Plaintiff was still struggling with coping with his divorce.  (*Id*.).  The doctor also commented,
"[w]e will, therefore, be supporting [House] robustly in his quest for disability in view of his
learning disorder and long-standing major depressive disorder with poor prognosis and inability
to hold on [to] jobs as well as his IQ, which has been low."  (*Id*.).

On July 2, 2010, Plaintiff presented to the emergency room with complaints of suicide and
again was admitted to the hospital.  (Tr. 533).  House received in-patient treatment until July 12,
2010, when he was discharged.  (*Id*.).  Dr. Nkanginieme's records show that Plaintiff had
stopped taking his insulin and was feeling hopeless.  (Tr. 534).  Dr. Nkanginieme opined that
House's judgment and insight were poor with regard to coping and that his affect was flat.  (*Id*.).

---

[5] The questionnaire specifically defined three types of limitations: (1) "[s]eriously limited, but
not precluded" meaning the "ability to function in this area is seriously limited and less than
satisfactory, but not precluded in all circumstances; (2) "[u]nable to meet competitive standards"
meaning the "patient cannot satisfactorily perform this activity independently, appropriately,
effectively and on a sustained basis in a regular work setting"; and (3) "[n]o useful ability to
function" meaning that the "patient cannot perform this activity in a regular work setting".  (Tr.
514).

7

Upon discharge, the doctor noted Plaintiff was in "good" condition; he was fully alert and oriented, denied thoughts or plans to harm himself or others and his GAF score was rated at 60. (Tr. 533-34).

## IV.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law.  At step one of the five-step sequential analysis, the ALJ found House had not engaged in substantial gainful activity since his alleged onset date of July 10, 2007.  (Tr. 21).  At step two, the ALJ ruled Plaintiff suffered from the following severe impairments:  substance addiction disorder in reported remission, bipolar disorder and personality disorder.  (*Id*.).  But, at the next step, the ALJ determined that none of these impairments, individually or combined, met or equaled one of the listed impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 22).

Before moving to the next step, the ALJ assessed House's RFC.  He concluded House retained the ability to perform a limited range of work.  (*Id*.).  Although the ALJ held House did not require any exertional restrictions on the types of work he performed, the ALJ found House was limited to simple, routine, low-stress tasks.  (*Id*.).  The ALJ also incorporated other non-exertional restrictions into his RFC assessment.  (*Id*.).

Based upon the ALJ's RFC finding, he ruled House was unable to return to any of his past relevant work.  (Tr. 29).  Nevertheless, the ALJ held Plaintiff was capable of performing other work which existed in significant numbers in the national economy.  (Tr. 29-30). The ALJ found that laundry workers, industrial cleaners and auto detailers were representative of the types of jobs House could perform.  (Tr. 30).  As a result, the ALJ concluded House had not been under a disability from his alleged onset date of July 10, 2007, through the date of the ALJ's decision.  (Tr. 30-31).

8

## V.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## VI.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards.  *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001)*; Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.*  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)*; Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all the evidence

in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VII.  ANALYSIS

Plaintiff only presented one assignment of error attacking the ALJ's decision.  Plaintiff contends the ALJ did not properly analyze the opinion of his treating psychiatrist, Dr. Nkanginieme Ike.  The undersigned agrees.

It is well-recognized that an ALJ must give special attention to the findings of a claimant's treating sources.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). This doctrine, often referred to as the "treating source rule", is a reflection of the Social Security Administration's awareness that physicians who have a long-standing treatment relationship with an individual are best equipped to provide a complete picture of the individual's health and treatment history.  *Id.*; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).[6]  The treating source doctrine requires opinions from treating physicians to be given controlling weight where the opinion is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record."  *Wilson*, 378 F.3d at 544.

Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations.  20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).  The regulations

---

[6]Effective March 26, 2012, sections 404.1527 and 416.927 of the Code of Federal Regulations were amended.  Paragraph (d) of each section was redesignated as paragraph (c).  *See 77 F.R. 10651-01, 2011 WL 7404303*.

also require the ALJ to provide "good reasons" for the weight ultimately assigned to the treating source's opinion.  *Id*.  An ALJ's failure to adhere to this doctrine may necessitate remand. *Wilson*, 378 F.3d at 545.

The Sixth Circuit has explained that the good reasons requirement serves a two-fold purpose.  First, "the explanation lets claimants understand the disposition of their cases, particularly where a claimant knows that his physician has deemed his disabled and therefore might be bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (*quoting Wilson*, 378 F.3d at 544) (internal quotations omitted).  Second, "the explanation ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Id.* at 243.  Remand is appropriate when an ALJ fails to provide adequate reasons explaining the weight he assigned to the treating source's opinions, even though "substantial evidence otherwise supports the decision of the Commissioner."  *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 860 (6th Cir. 2011) (*quoting Wilson*, 378 F.3d at 543-46).

In the instant case, the ALJ failed to adhere to this doctrine.  To begin, the ALJ failed to expressly indicate how much weight he afforded Dr. Nkanginieme's opinion.  It is clear the ALJ did not assign the opinion controlling weight because the ALJ indicated he was not persuaded by the doctor's opinion.  However, other than that, it is difficult to determine whether the ALJ gave the opinion *any* weight.

Putting that error aside, the ALJ's analysis of the doctor's opinion remains faulty.  The ALJ provided two reasons for discrediting Dr. Nkanginieme's opinion.  First, the ALJ stated that the doctor's findings were "inconsistent with [the doctor's] statement that Mr. House's

11

symptoms [we]re only moderately severe."  (Tr. 28).   Second, the ALJ believed that Dr. Nkanginieme's findings did not reflect his "dispassionate, professional opinion."  (*Id*.).  Neither of these reasons is sufficient to carry the ALJ's decision today.

As the Sixth Circuit recognized in *Friend v. Commissioner of Social Security*, 375 F. App'x 543, 551 (6th Cir. 2010), an ALJ may not dismiss a treating source's opinion wholesale merely because the ALJ finds the opinion to be inconsistent with other evidence.  An ALJ's inquiry into whether a treating physician's opinion is consistent with the remaining medical evidence is merely the first step under the treating source doctrine.  *See Wilson*, 378 F.3d  at 544. If the ALJ finds any inconsistency, he must then proceed to the second step of the doctrine and determine how much weight to assign the opinion, despite the noted inconsistency.  *Friend*, 375 F. App'x at 551-52.  Thus, "even when an ALJ *correctly* reaches a determination that a treating source's medical opinion is inconsistent with the other substantial evidence in the record, such a determination 'means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.'"  *Id.* at 551 (emphasis in original); *see Brewer v. Astrue*, No. 4:11-cv-00081, 2012 WL 262632, at *8 (N.D.Ohio Jan. 30, 2012) ("permitting an ALJ to reject a treating physician's opinion solely on the basis that it is inconsistent with the opinion of a non-treating physician would effectively eviscerate the treating physician rule").  Accordingly, once the ALJ found Dr. Nkanginieme's opinion was inconsistent with the other evidence, it became the ALJ's responsibility to further examine the opinion and determine the weight to which it was entitled and thereafter supply "good reasons" for the decision reached.  This is not to say that the ALJ's determination of inconsistency was sufficiently specific to satisfy the treating source rule. The Court need not reach that decision today as it is of no consequence given the ALJ's latter failure.  Even if the ALJ correctly concluded that Dr. Nkanginieme's opinion was inconsistent

12

with his treatment notes, the ALJ erred by failing to provide good reasons for the weight ultimately attributed to the doctor's opinion.

The only remaining reason provided by the ALJ for his unfavorable view of Dr. Nkanginieme's opinion was that it appeared not to represent the doctor's "dispassionate, professional opinion." (Tr. 28). The ALJ took issue with the comment in the doctor's June 25, 2010 treatment note which stated that he was going to "support[] [Plaintiff] robustly in his quest for disability". (Tr. 28, 538). Based upon this statement, the ALJ felt the doctor viewed himself as House's advocate, and that his findings were skewed thereby. However, besides this single comment, the ALJ failed to identify any other instances of the doctor "advocating" on Plaintiff's behalf.

The undersigned is not satisfied that this reason was good enough in order to comport with the treating source rule. While it is appropriate for ALJs to be mindful that opinions rendered from treating sources may be bias in an effort to help their patients receive disability benefits, *see Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001), such bias will not exist in every case. The purpose of the treating source rule is to force ALJs to engage in meaningful review of such doctors' opinions, given their special knowledge of the claimant and his/her ailments. But, in the instant case, the ALJ failed to offer a "good reason" for disfavoring the doctor's findings. In light of the doctor's statement, it was certainly appropriate for the ALJ to consider whether the doctor's findings were purposely skewed. However, without evidence signaling that the doctor affirmatively altered his findings in an effort to help Plaintiff, the ALJ's interpretation of the doctor's statement is purely conjecture. Consequently, the ALJ's dependence on this single statement falls well short of constituting a good reason for completely discrediting Dr. Nkanginieme's findings.

13

In addition, the ALJ mischaracterized the medical findings contained within Dr. Nkanginieme's mental RFC assessment.[7]  The ALJ held that the doctor found House was "unable to meet competitive standards" in "virtually every area of psychological functioning". (Tr. 28).  However, this description gravely exaggerates the doctor's findings.  Instead, Dr. Nkanginieme only limited House thusly in less than half of the areas of functioning reviewed.  It is not clear to what extent this mischaracterization influenced the ALJ's review of Dr. Nkanginieme's opinion, but it appears to have had some effect upon the ALJ's analysis.  It is also worth noting that Dr. Nkanginieme rated Plaintiff's psychological functioning abilities *prior to* the date in which he made the statement indicating that he would robustly support House's quest for disability.  Thus, even if Dr. Nkanginieme's statement reflected his intent to advocate for House henceforth, there has been no proof presented showing that the doctor's statements reflected his past behavior.  Furthermore, neither the ALJ nor the Commissioner identified any other evidence probative of the doctor's bias.

Nevertheless, there are instances where an ALJ's failure to comport with the treating source doctrine may be deemed harmless.  A violation of the rule might constitute "harmless error" where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of §

---

[7] Contrary to the Commissioner's suggestion, these findings were properly characterized as medical findings.  The regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite impairment(s), and [his] physical or mental restrictions."  20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) ; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009).

1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation."  *Wilson*, 378 F.3d at 547.  But, none of these exceptions apply in this case.  Neither the ALJ nor the Commissioner claimed that Dr. Nkanginieme's findings were patently deficient.  In fact, his findings tend to be reflective of Plaintiff's long-standing problems with depression and other mental illnesses.  Certainly, the ALJ did not adopt findings consistent with the doctor's opinion.   Nor did the ALJ provide an adequate explanation of why he rejected Dr. Nkanginieme's opinion.  As a result, remand is necessary in order for the ALJ to reassess this medical opinion and, if rejected, offer a proper basis for the weight assigned to it.

## VIII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the Court recommends that the decision of the Commissioner be **VACATED** and the case be **REMANDED** back to the administration.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge


Date: June 19, 2013.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn,* *474 U.S. 140 (1985)*; *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).